# United States Court of Appeals for the Federal Circuit

---

**BAYER CROPSCIENCE AG, BAYER S.A.S.,**
*Plaintiffs-Appellants*

**v.**

**DOW AGROSCIENCES LLC,**
*Defendant-Appellee*

---

2015-1854

---

Appeal from the United States District Court for the District of Delaware in No. 1:12-cv-00256-RMB-JS, Judge Renée Marie Bumb.

---

Decided: March 17, 2017

---

ADAM MORTARA, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, IL, argued for plaintiffs-appellants. Also represented by DANIEL CHARLES TAYLOR, Denver, CO; ROBERT J. KOCH, Milbank, Tweed, Hadley & McCloy, LLP, Washington, DC; CHRISTOPHER JAMES GASPAR, New York, NY.

MARK S. DAVIES, Orrick, Herrington & Sutcliff LLP, Washington, DC, argued for defendant-appellee. Also represented by KATHERINE M. KOPP; PETER A. BICKS, ALEX V. CHACHKES, ANDREW D. SILVERMAN, AARON SCHERZER, New York, NY.

---

Before NEWMAN, CHEN, and STOLL, *Circuit Judges.*

STOLL, *Circuit Judge.*

Bayer appeals the district court's award of attorney fees to Dow under 35 U.S.C. § 285. The district court awarded attorney fees to Dow upon finding that the case stood out from others and was thus exceptional. Because the district court did not abuse its discretion in finding the case exceptional and awarding fees, we affirm.

BACKGROUND

This is the second appeal to our court in this patent infringement lawsuit between plaintiffs-appellants Bayer CropScience AG and Bayer S.A.S. (collectively, "Bayer") and defendant-appellee Dow AgroSciences LLC. The patents-in-suit relate to soybeans genetically engineered to tolerate herbicide, and, particularly, to the Bayer-developed *dmmg* gene. The first appeal centered on the merits of a contractual dispute. The parties disagreed over the scope of Bayer's license of the patents-in-suit to a Dow business partner, M.S. Technologies, LLC ("MS Tech"), and, specifically, whether the license granted MS Tech a broad license to commercialize and sublicense the soybean technology. MS Tech sublicensed to Dow whatever patent rights it received from Bayer. When Bayer sued Dow for infringement of these patents, Dow raised the MS Tech sublicense as an affirmative defense.

On summary judgment, Bayer argued that it had only licensed MS Tech rights to non-commercial exploitation of the *dmmg* patents, and thus, Dow's activity with MS Tech in commercializing *dmmg* gene soybeans infringed the patents-in-suit. Dow countered that the Bayer–MS Tech agreement conveyed to MS Tech broad rights—including commercialization of the patents-in-suit—by its terms, but especially in view of the facts surrounding the agree-

ment negotiations. The parties agreed that English law governed the agreement, and under English law, the background or surrounding circumstances of contract formation are considered when interpreting the agreement. The district court agreed with Dow's interpretation of the Bayer–MS Tech agreement and entered summary judgment in its favor. *Bayer CropScience AG v. Dow AgroSciences LLC*, No. CV 12-256-RMB-JS, 2013 WL 5539410 (D. Del. Oct. 7, 2013). Our court affirmed that decision. *Bayer CropScience AG v. Dow AgroSciences LLC*, 580 F. App'x 909 (Fed. Cir. 2014) (*Bayer I*).

The case returned to the district court, where the court awarded Dow attorney fees pursuant to 35 U.S.C. § 285. The magistrate judge who had managed the case, having been briefed on the § 285 issue by both parties and having conducted a two-day hearing on the matter, issued a thorough report and recommendation declaring a "firm conviction that this is an 'exceptional case'" and recommending fee-shifting under § 285. *Bayer CropScience AG v. Dow AgroSciences LLC*, No. CV 12-256-RMB-JS, 2015 WL 108415, at *1 (D. Del. Jan. 5, 2015). The district judge who entered summary judgment for Dow then reviewed the magistrate's recommendation and adopted it in a thorough opinion of her own. The district judge examined the full duration of the litigation and concluded that, in her view, Bayer's weak positions on the merits and litigation conduct supported a finding that this was an exceptional case.

Specifically, the district judge emphasized that "Bayer's own witnesses as well as key documents contradicted Bayer's contorted reading of the contract" and that "Bayer's conduct in litigating this case in the face of evidence that contradicted its contorted reading of the Agreement was objectively unreasonable." *Bayer CropScience AG v. Dow Agrosciences LLC*, No. CV 12-256, 2015 WL 1197436, at *4, *8 (D. Del. Mar. 13, 2015) (*Fees Op.*). Bayer had argued that it did not grant Dow's business

partner, MS Tech, commercialization rights to the *dmmg* gene patents, relying in large part on the emphasized exception clause in the license grant:

> The SELLER [Bayer] hereby grants to the PURCHASER [MS Tech] . . . a worldwide, fully paid-up, exclusive license – with the right to grant sublicenses solely as set out in Article 3.1.3 and *with the exception of the rights to increase, market, distribute for sale, sell and offer for sale, granted to STINE by separate agreement . . . .*

J.A. 339 (emphasis added). The referenced Stine agreement was a non-exclusive license Bayer gave to Stine Seed Farm, Inc.—an entity working closely with MS Tech—which specifically granted the enumerated commercialization rights listed in the MS Tech agreement (i.e., right to increase, market, distribute for sale, sell, and offer for sale). Bayer argued that this exception in the MS Tech agreement referencing the Stine agreement carved all commercialization rights completely out of the MS Tech license. Dow posited instead that the provision simply indicated that the MS Tech license was not exclusive with respect to the separate license rights Stine had been granted. The parties each presented textual arguments—citing other provisions in both the MS Tech and Stine agreements—to support their respective positions. In addition, the parties relied on expert testimony to interpret the agreements' terms, as well as extrinsic evidence regarding the parties' understanding of the agreement because such evidence is highly relevant under the governing English law.

In its decision awarding attorney fees, the district judge found that Bayer's arguments were "fallacious" because they were "implausible" and "made no business sense" in light of the facts surrounding the agreements and their negotiation. *Fees Op.*, 2015 WL 1197436, at *6–7. For example, the district court noted that Bayer was

unable to adduce testimonial evidence from those involved in negotiating the agreement—including those working for Bayer—that anyone understood the agreement as carving out commercialization rights from the MS Tech agreement. To the contrary, the district court pointed to testimony of a Bayer executive at the time of the deal that "the value of these assets for [MS Tech/Stine] was in [the] ability to make full use of them" and further that "[i]t seems incongruous that we would sell an asset to somebody, receive remuneration for the sale, and then somehow prevent the acquirer from making use of the asset he just acquired." *Id.* at *5 (alterations in original) (emphases omitted) (quoting Morgan Dep., J.A. 4481 p. 62 ll. 6–8; J.A. 4488 p. 91 ll. 16–19). The district court also found Bayer's position in striking tension with remarks it made upon the agreement's execution in a congratulatory email sent to individuals concurrently serving as executives of both MS Tech and Stine: "[W]e are convinced that in your capable hands these 'products' will find their true worth in the market." *Id.* (emphasis omitted) (quoting J.A. 13654).

The district court also expressed concern about the logical import of Bayer's argument. Under Bayer's theory, it retained commercialization rights in the *dmmg* gene patents. The district court found this position to be in conflict with Bayer's own evidence. A Bayer executive at the time of the deal testified that "it was relatively black and white certainly in my mind that we were divesting these assets." *Id.* (quoting Morgan Dep., J.A. 4481 p. 62 ll. 3–5) (emphasis omitted). Further, the congratulatory email that the Bayer executive sent had remarked: "We [Bayer] wish you every success in capturing the intrinsic value that these assets promise. We were disappointed that Bayer was unable to convert that potential given our (lack of) market presence . . . ." *Id.* (quoting J.A. 13654).

The district court identified other specific instances of Bayer's litigation conduct as supporting its exceptional

case determination. Specifically, the district court criticized Bayer's decision to add its *dmmg* gene patent allegations to an on-going Bayer–Dow lawsuit only a few days after MS Tech and Dow issued a joint press release, announcing the entities' plans to pursue commercializing *dmmg*-gene soybeans. The district court found Bayer's pre-suit diligence lacking, observing: "The positions Bayer took to support their contract interpretation arguments were directly contradicted by the record evidence Bayer had obtained through early discovery and Bayer should have made every effort to discover before filing suit." *Id.* at *9. In the district court's judgment, "[h]ad Bayer done any due diligence, it would have learned that no witness supported Bayer's construction of the Agreement and this case [] should never have been filed." *Id.* at *8.

The district court also found fault with Bayer's decision to move for a preliminary injunction against Dow amidst targeted discovery on the dispositive contract dispute. That discovery, including depositions of Bayer witnesses, would ultimately "debunk[] Bayer's claims," according to the district court. *Id.* at *9. Thus, the district court found that Bayer's preliminary injunction motion "was frivolous and unnecessarily increased the costs of litigation." *Id.* The district court lastly criticized Bayer for taking seemingly contradictory positions regarding ownership of a particular soybean—Enlist E3—in this case and an ongoing arbitration between the parties.

After identifying these aspects of Bayer's case, the district court concluded that, relative to other cases, this was an exceptional case that entitled Dow to fees under § 285. Bayer timely appealed, and we have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

I.

Section 285 of the Patent Act provides:  "The court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  In *Octane Fitness*, the Supreme Court clarified what constitutes an exceptional case:

> [A]n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.  District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).  After *Octane Fitness*, a fee-seeking party must show that it is entitled to § 285 fees by a "preponderance of evidence," *id.* at 1758—a "change in the law lower[ing] considerably the standard for awarding fees," *Oplus Technologies, Ltd. v. Vizio, Inc.*, 782 F.3d 1371, 1374 (Fed. Cir. 2015).

The Supreme Court addressed our standard of review for § 285 cases in *Highmark Inc. v. Allcare Health Management System, Inc.*, 134 S. Ct. 1744 (2014)—a case argued together with *Octane Fitness* and decided on the same day.  The Supreme Court held "that an appellate court should review all aspects of a district court's § 285 determination for abuse of discretion."  *Id.* at 1747.  The Court explained:

> "[A]s a matter of the sound administration of justice," the district court "is better positioned" to decide whether a case is exceptional, because it lives with the case over a prolonged period of time. . . .

> [T]he question is "multifarious and novel," not susceptible to "useful generalization" of the sort that *de novo* review provides, and "likely to profit from the experience that an abuse-of-discretion rule will permit to develop."

*Id.* at 1748–49 (citation omitted) (quoting *Pierce v. Underwood*, 487 U.S. 552, 559–60, 562 (1988)).

Abuse of discretion is a highly deferential standard of appellate review. Indeed, "deference [to the trial court] . . . is the hallmark of abuse-of-discretion review." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997). To meet the abuse-of-discretion standard, the moving party must show that the district court has made "a clear error of judgment in weighing relevant factors or in basing its decision on an error of law or on clearly erroneous factual findings." *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 150 F.3d 1374, 1377 (Fed. Cir. 1998) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1039 (Fed. Cir. 1992) (en banc)); *see also Highmark*, 134 S. Ct. at 1748 n.2.

## II.

We cannot say that the district court abused its discretion in this case. At the outset, we recognize that the district court applied the correct legal test under § 285. Indeed, it examined the totality of the circumstances to determine whether the case stood out from others. *See Octane Fitness*, 134 S. Ct. at 1756. The district court's opinion thoroughly demonstrated the totality-of-the-circumstances approach, detailing the reasons why Bayer's positions on the merits and litigation tactics coalesced in making this case, in its judgment, exceptional.

On appeal, Bayer first argues that the district court erred in finding the case exceptional because "Bayer had an objectively reasonable case on the merits." Reply

Br. 1. The Supreme Court rejected such a rigid approach in *Octane Fitness*, holding that whether a party's merits position was objectively reasonable is not dispositive under § 285. *Octane Fitness*, 134 S. Ct. at 1756. Instead, the Supreme Court adopted a holistic and equitable approach in which a district court may base its discretionary decision on other factors, including the litigant's unreasonableness in litigating the case, subjective bad faith, frivolousness, motivation, and "the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 1756–57, 1756 n.6.

Here, the district court considered factors beyond the merits—including Bayer's litigation conduct—and emphasized that "Bayer's conduct in litigating this case in the face of evidence that contradicted its contorted reading of the Agreement was objectively unreasonable." *Fees Op.*, 2015 WL 1197436, at *8. The court explained that "if this were a case involving a colorable dispute regarding contract language, this would not be an exceptional case. But this case is not such case. Far from it." *Id.* at *9. The district court further explained that, in its view, this case stood out from others because "[t]he positions Bayer took to support their contract interpretation arguments were directly contradicted by the record evidence Bayer had obtained through early discovery and Bayer should have made every effort to discover before filing suit." *Id.* Summarizing, the court explained that "Bayer marched onward with a view of its case that was not supported by its witnesses." *Id.* at *9.

The court did not abuse its discretion in so finding. One Bayer executive at the time of the deal testified that Bayer did not retain commercial rights because "it was relatively black and white certainly in my mind that we were divesting these assets." *Fees Op.*, 2015 WL 1197436, at *5 (quoting Morgan Dep., J.A. 4481 p. 62 ll. 3–5). He further testified that "[i]t seems incongruous that we would sell an asset to somebody, receive remuneration for

the sale, and then somehow prevent the acquirer from making use of the asset he just acquired." *Id.* (quoting Morgan Dep., J.A. 4488 p. 91 ll. 15–19). An email Bayer sent to executives for Stine and MS Tech remarked that "in your capable hands these 'products' will find their true worth in the market." *Id.* (emphasis omitted) (quoting J.A. 13654). As the district court explained, the parties agreed that English law governed the Bayer–MS Tech contract. The parties further agreed that under English law, the background facts and circumstances surrounding the agreement—known in English law as the "factual matrix"—must be considered in construing the contract's terms. *Id.* at *8. As such, the district court permissibly relied on the testimony of Bayer's witnesses to discredit Bayer's interpretation.

The district court likewise did not abuse its discretion in concluding that Bayer failed to perform a diligent pre-suit investigation of its claims against Dow. Bayer's own witnesses testified against its contract interpretation. We cannot say that the district court erred in reasoning that had Bayer conducted a more searching pre-suit investigation—at least of its own easily-obtainable evidence—it would have not filed suit. Nor did the district court err in treating pre-suit diligence as a factor in the totality-of-the-circumstance approach, as we have previously approved of this consideration in § 285 determinations. *See Lumen View Tech. LLC v. Findthebest.com, Inc.*, 811 F.3d 479, 481–83 (Fed. Cir. 2016).

Bayer also argues that the district court abused its discretion in awarding fees because Bayer's expert, Lord Collins, a former Justice of the Supreme Court of the United Kingdom, "rendered his professional judgment that . . . Bayer's interpretation of the MS Tech license was correct." Appellant Br. 15. We reject Bayer's argument. As the district court explained, Bayer's English-contract-law expert testified that he had only considered the text of the agreement itself in rendering his opinion. He admit-

ted that he was completely unaware of the factual matrix in this case and that his opinion was incomplete because one must consider the factual matrix in construing a contract under English law.

On appeal, Bayer also asks us to reweigh evidence in a manner inconsistent with *Highmark*'s guidance that we review "all aspects of a district court's § 285 determination for abuse of discretion." *Highmark*, 134 S. Ct. at 1747. For example, the district court found Bayer's filing of its motion for a preliminary injunction nearly eighteen months after alleging infringement "frivolous." *Fees Op.*, 2015 WL 1197436, at *9. The court explained that Bayer's motion "unnecessarily increased the costs of litigation" and was a factor for deeming this case exceptional. *Id.* Bayer argues on appeal that it was not improper for it to move for a preliminary injunction eighteen months after alleging infringement. But the timing of Bayer's motion relative to alleging infringement was not what drove the district court's fees determination; in fact, the district court considered the motion "early" since Bayer sought the injunction before Dow sold any *dmmg* gene products. *Id.* Rather, what concerned the district court was that Bayer moved for a preliminary injunction amidst targeted discovery on the very contract dispute that would prove fatal to its case. The court explained that Bayer sought the injunction while the parties were conducting depositions and learned of "deposition testimony of Bayer's own witnesses that debunked Bayer's claims." *Id.* Against this backdrop, it was not an abuse of discretion for the district court to conclude that Bayer's seeking of a preliminary injunction—a "drastic and extraordinary remedy" requiring a movant show, *inter alia*, likelihood of success on the merits and irreparable harm in its absence, *Murata Machinery USA v. Daifuku Co.*, 830 F.3d 1357, 1363 (Fed. Cir. 2016) (quoting *National Steel Car, Ltd. v. Canadian Pacific Railway*, 357 F.3d 1319, 1324–25 (Fed. Cir. 2004))—was "frivolous and

unnecessarily increased the costs of litigation," *Fees Op.*, 2015 WL 1197436, at *9.

Bayer's additional factual arguments do not convince us that the district court abused its discretion either. For example, Bayer continues to infer—as it did during the first appeal to this court—that Stine obtained commercial rights and MS Tech did not from the fact that Stine paid more for its license than did MS Tech. Dow, however, presented a plausible explanation for the price disparity. Specifically, Dow explained that MS Tech was undercapitalized because of costs it incurred seeking regulatory approval, and therefore had the closely-related Stine entity bear the brunt of the licensing cost. Furthermore, Bayer's own witness testimony did not support its inference. Bayer's corporate witness testified that "Stine paid more than, than MS Tech, but I don't know why that was the case," Schulte Dep., J.A. 3465 p. 115 ll. 23–25, and another Bayer witness involved in the deal further testified that "I don't believe that [] we cared as between those companies how it was divided up," Keating Dep., J.A. 7454 p. 97 ll. 15–16. We cannot say, especially in an abuse-of-discretion review, that the district court erred in rejecting Bayer's argument regarding price of the license as a "manufactured inference." *Fees Op.*, 2015 WL 1197436, at *7.

Equally unavailing is Bayer's argument that we should interpret the congratulatory email that it sent to individuals working for both Stine and MS Tech as only applying to their respective roles at Stine. The email remarked: "[W]e are convinced that in your capable hands these 'products' will find their true worth in the market." J.A. 13654. While the email was sent to the individuals' Stine email accounts, a Bayer news release announcing the deal identified one of those individuals as a Director of MS Tech and quoted him as saying that partnering with Bayer "will help us bring these novel products to market." *Fees Op.*, 2015 WL 1197436, at *9 (emphasis omitted).

This evidence suggests that Bayer considered at least this individual as an executive of both Stine and MS Tech, and the district court did not abuse it discretion in inferring that the email was not limited to the executive's role with Stine.

We have considered Bayer's remaining arguments and find them unpersuasive to show that the district court abused its discretion.

## CONCLUSION

For the foregoing reasons, we hold that the district court did not abuse its discretion in determining that, under the totality of the circumstances, this was an exceptional case, and we affirm the district court's grant of § 285 fees.

## **AFFIRMED**

## COSTS

Costs to appellee.